IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARK SAMSEL, on behalf of himself
and all others similarly situated,

      Plaintiff,

  v.

OVERBY-SEAWELL COMPANY

    and

KEYBANK, N.A.

      Defendant.

Case No.

**Complaint – Class Action**

**Demand for Jury Trial Enclosed**

## INTRODUCTION

1.    This case arises from a data breach. Defendant Overby-Seawell Company provides services to banks and other financial institutions. One of its clients is Defendant KeyBank, N.A., a sophisticated company that collects highly sensitive data about its clients including social security numbers, financial information, and other details. KeyBank's customers and the customers of other financial services companies have no choice but to trust Overby-Seawell to keep their data secure.

2.    In a story that has become all too familiar, an unauthorized third-party gained access to Overby-Seawell's network around July 5, 2022 and absconded with personally identifying and financial information (PII).

Criminals can now sell the victims' data on the black market for the purpose of stealing their identities. None of this would have occurred if Overby-Seawell had implemented reasonable data security measures.

3.     Plaintiff Mark Samsel was a victim of the data breach. He brings this action on behalf of himself and all others similarly situated, seeking damages for the injuries that Defendants' negligence have and will cause, as well as injunctive relief to ensure that the data Defendants continue to store will be protected by reasonable data security practices going forward.

## PARTIES

4.     Plaintiff Mark Samsel is a resident of Avon, Ohio.

5.     Defendant Overby-Seawell Company is a Georgia corporation with a principal place of business in Kennesaw, Georgia. Overby-Seawell made the decisions giving rise to the data breach from its Georgia headquarters.

6.     Defendant KeyBank, N.A. is a company with its principal place of business located in Cleveland, Ohio. KeyBank periodically sells commercial and residential mortgage loans.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over Overby-Seawell because its principal place of business is (and at all relevant times was) located in Kennesaw, Georgia.

8.     KeyBank consented to this Court's general jurisdiction by obtaining authorization to do business in Georgia under O.C.G.A. § 14-2-

1510(b) and appointing a registered agent for service of process in this state. *See Cooper Tire & Rubber Co. v. McCall*, 312 Ga. 422, 434–35 (2021).

9.      In addition, this Court has specific jurisdiction over KeyBank because KeyBank purposefully availed itself of Georgia law by entrusting Plaintiff and class members' PII to a Georgia corporation, and its contacts with this state are closely related to this action.

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one member of the proposed Class, including Samsel, is a citizen of a state different from that of Overby-Seawell; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 class members, and none of the exceptions under the subsection apply to this action.

11.     Venue is proper because Overby-Seawell's principal place of business is located in the Northern District of Georgia. *See* 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

### A.      Overby-Seawell allowed Samsel's data to be stolen.

12.     According to the data breach notice that Samsel received, an unauthorized third-party gained remote access to Overby-Seawell's network on July 5, 2022 acquired information from Plaintiff and Class members. A true and correct copy of the Notice Letter is attached as Exhibit 1.

13.     Information pertaining to Plaintiff and Class members was part of the data acquired by an unauthorized external party in the Data Breach.

14.     The specific information that was acquired includes: name, mortgage property address, mortgage account number(s) and mortgage account information, phone number, property information, the first eight digits of Social Security numbers, and home insurance policy number and home insurance information.

15.     Because this data breach targeted financial and personally identifying information, it is reasonable to infer that the hackers will use victims' data for fraudulent purposes, including identity theft.

16.     Notably, Overby-Seawell is investigating this incident with the assistance of third-party cybersecurity experts. Because the investigation is not yet completed as of the filing of this Complaint, additional items of PII or facts may be uncovered or have already been uncovered and not disclosed.

17.     Since discovering the Data Breach, Overby-Seawell has "deployed enhanced security monitoring tools across their network."  Either such actions are meaningless window-dressing, and are therefore of no help whatsoever, or they actually are effective – which means that they should have been employed in the first place in order to have prevented or limited the impact of the Data Breach.  It will take discovery to determine which it is here.

18.     More than one month after the Data Breach was discovered and law enforcement was notified, KeyBank publicly announced the Data Breach and notified those of its customers who were placed at risk of identity theft. It also sent notices to various states' Attorneys General and to its customers whose

PII was acquired by criminals in the Data Breach.  It is currently unknown to Plaintiff how many other financial institutions' customers, besides KeyBank's, are also affected by this breach.

19.    The Notice Letter Plaintiff received says that that Class members should obtain credit monitoring and identity theft protection services to help them detect possible misuse of PII. *See* Exhibit 1. Class members are therefore at a substantial risk of identity theft.

20.    As a result of the Data Breach, Plaintiff and Class members have been and must continue to be vigilant and review their credit reports for incidents of identity theft, and educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft.

**B.    The data breach was highly foreseeable, yet Defendants failed to take reasonable precautions.**

21.    Given the type of data that Defendants collected and stored, it was highly foreseeable that bad actors would attempt to access it without permission.

22.    "[H]ackers are likely to be drawn to databases containing information which has a high value on secondary black markets," such as "identifying and financial data." Mark Verstraete & Tal Zarsky, *Optimizing Breach Notification*, 2021 U. ILL. L. REV. 803, 854–55 (2021). Consequently, "relevant and rational firms should engage in greater security investment and reduced collection—all steps to limit the prospects of a potential breach and subsequent notification." *Id.* at 855.

23.    Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

24.    KeyBank is well aware of its duty to keep customers' information secure. Its privacy policy states that it "take[s] the security of your data and information seriously," which is why it "use[s] sophisticated tools, technology and training to keep the information you entrust to us safe, protected and secure." *Privacy & Security: State-of-the-art security to help protect our clients*, KEYBANK (accessed Sept. 6, 2022), https://www.key.com/about/security/privacy-security.html.

25.    KeyBank further promised in its privacy policy that it would "safeguard your information" using "[i]ndustry-leading cybersecurity tools, practices and technology," "[m]ultifactor identification practices that protect clients' identities," and its "Cyber Defense Center, which tracks the latest threats." *Id.*

26.    Because Defendants collected and stored identifying and financial information that is very valuable to criminals, it was highly foreseeable that a bad actor would attempt to access that data without permission.

27.    Defendants frequently collects and store personally identifying and financial information. Therefore, the burden (if any) of implementing

reasonable data security practices is minimal in comparison to the substantial and highly foreseeable risk of harm.

28. On information and belief, Defendants failed to adequately train their employees on even the basic cybersecurity protocols, including:

    a. Effective password management and encryption protocols, including, but not limited to, the use of multi-factor authentication for all users;

    b. Locking, encrypting and limiting access to computers and files containing sensitive information;

    c. Implementing guidelines for maintaining and communicating sensitive data;

    d. Protecting sensitive patient information, including personal and financial information, by implementing protocols on how to request and respond to requests for the transfer of such information and how to securely send such information through a secure file transfer system to only known recipients; and

    e. Providing focused cybersecurity awareness training programs for employees.

29. The FTC has noted the need to factor data security into all business decision-making. *Start With Security, A Guide for Business*, FTC (accessed June 9, 2022), https://bit.ly/3mHCGYz. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security

features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software. *Id.*

30.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the data breach, further clarify the measures businesses must take to meet their data security obligations.

31.     On information and belief, Defendants' use of outdated and insecure computer systems and software that are easy to hack, and their failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PII of Plaintiff and thousands of members of the proposed Classes to unscrupulous operators, con artists, and outright criminals.

32.     Defendants violated their obligation to implement best practices and comply with industry standards concerning computer system security, which allowed class members' data to be accessed and stolen by criminals.

### C.     Samsel's information was exposed in the data breach, which caused him to suffer concrete injuries.

33.     Plaintiff Mark Samsel has banked with KeyBank since 2009, and he had a residential mortgage with KeyBank from 2017 until March 2020. On information and belief, KeyBank provided Samsel's personally identifying and financial information to Overby-Seawell.

34.     Samsel received a data breach notification informing him that his personally identifying and financial information was accessed in the breach.

35.     Plaintiff's PII was compromised in the data breach and was likely stolen and in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

36.     Plaintiff typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

37.     Plaintiff stores any documents containing his PII in a safe and secure location, and he diligently chooses unique usernames and passwords for his online accounts.

38.     As a result of the data breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the data breach, Plaintiff has spent significant time monitoring his accounts and credit score and has sustained emotional distress in addition to his lost time. This is time that was lost and unproductive and took away from other activities and duties.

39.     Plaintiff also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Keybank—which was compromised in and as a result of the data breach.

40.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the data breach and has anxiety and increased concerns for the loss of his privacy.

41.     Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of criminals.

42.     Defendants continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff would not have entrusted his PII to Defendant KeyBank had he known that it would fail to maintain adequate data security. Plaintiff's PII was compromised and disclosed as a result of the Data Breach.

43.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the data breach. As a result of the data breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

44.     Because their personally identifying and financial information has been accessed by criminals, Plaintiff and the Classes have suffered concrete and ongoing injuries.

45.     Plaintiff and the Classes are at an imminent and substantial risk of identity theft.

46.     According to experts, one out of four data breach notification recipients become a victim of identity fraud. *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, THREATPOST.COM (Feb. 21, 2013), https://bit.ly/3zB8Uwv.

47.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PHI can be worth up to $1,000.00 depending on the type of information obtained. *See* Brian Stack, *Here's How Much Your*

*Personal Information is Selling for on the Dark Web*, EXPERIAN (Dec. 15, 2017), https://bit.ly/2Ox2SGY.

48.     The value of Plaintiff and the proposed Classes' PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

49.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to milk that information for cash.

50.     One such example of criminals using PII for profit is the development of "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account)

without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://bit.ly/3Qj2eJd.

51.    Cyber-criminals can cross-reference two sources of PII to marry unregulated or partial data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete "Fullz" dossiers on individuals.

52.    The development of "Fullz" packages means that stolen PHI from the data breach can easily be used to link and identify it to Plaintiff's and the proposed Classes' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the data breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is likely what is already happening to Plaintiff and members of the proposed Classes, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Classes' stolen PII is being misused, and that such misuse is fairly traceable to the data breach.

53.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest

number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

54.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."

55.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

56.     In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of new account identity theft, and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

57.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Classes will need to be remain vigilant against unauthorized data use for years or even decades to come.

58.     Moreover, the breach has diminished the value of Plaintiff and the Classes' personal information.

59.     The FTC has recognized that consumer data is a new and valuable form of currency. In a FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency." *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FTC (Dec. 7, 2009), https://bit.ly/3xKfzmu.

60.     Since it was included in the breach, Plaintiff and the Classes' information has already been accessed by criminals, which decreases its value in the marketplace.

61.     Therefore, the value of Plaintiff and the Classes' personal information was reduced by the data breach.

62.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

63.     Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained

and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

64.     None of those injuries would have occurred if Defendants had implemented reasonable data security practices.

## CLASS ACTION ALLEGATIONS

65.     Pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), Plaintiff seeks certification of a Class defined as follows:

> All individuals in the United States whose personal information was compromised in connection with the data breach affecting Overby-Seawell Company on or around July 5, 2022.

66.     Pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), Plaintiff seeks certification of a Subclass defined as follows:

> All KeyBank customers whose personal information was compromised in connection with the data breach affecting Overby-Seawell Company on or around July 5, 2022.

67.     Excluded from the Class and Subclass are: (a) Defendants and their officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

68.     *Ascertainability*. The Classes can be readily identified through KeyBank and Overby-Seawell's records, which is demonstrated by the fact

that many class members have already been identified and sent notice letters regarding the data breach.

69.     *Numerosity.* On information and belief, Overby-Seawell provides services to KeyBank and other financial institutions in connection with thousands of clients. Therefore, the Classes  are so numerous that individual joinder is impracticable.

70.     *Typicality.* Plaintiff's claims are typical of the Classes he seeks to represent. Like all class members, Plaintiff's personal information was exposed in the data breach as a result of Defendant's failure to implement reasonable data security measures. Thus, Plaintiff's claims arise out of the same conduct and are based on the same legal theories as those of the absent class members.

71.     *Adequacy of Class Representative.* Plaintiff will fairly and adequately protect the interests of the Classes. He is aware of his fiduciary duties to absent class members and is determined to faithfully discharge his responsibility. Plaintiff's interests are aligned with (and not antagonistic to) the interests of the Classes.

72.     *Adequacy of Counsel.* In addition, Plaintiff has retained competent counsel with considerable experience in class action and other complex litigation, including data breach cases. Plaintiff's counsel have done substantial work in identifying and investigating potential claims in this action, have considerable knowledge of the applicable law, and will devote the

time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Classes.

73. *Commonality and Predominance.* This case presents numerous questions of law and fact with answers common to the Classes that predominate over questions affecting only individual class members. Those common questions include:

   a. Whether Defendants had a duty to use reasonable care to safeguard Plaintiff and the Classes' PII;

   b. Whether Defendants breached the duty to use reasonable care to safeguard the Classes' PII;

   c. Whether Defendants breached its contractual promises to safeguard Plaintiff and the Classes' PII;

   d. Whether Defendants knew or should have known about the inadequacies of their data security policies and system and the dangers associated with storing sensitive PII;

   e. Whether Defendants failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff and the Classes' PII from unauthorized release and disclosure;

   f. Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendants' computer systems to safeguard and protect Plaintiff and the Classes' PII from unauthorized release and disclosure;

   g. Whether the data breach was caused by Defendants' inadequate cybersecurity measures, policies, procedures, and protocols;

   h. Whether Defendants are liable for negligence, gross negligence, or recklessness;

    i.   Whether Defendants' conduct, practices, statements, and representations about the data breach of the PII violated applicable state laws;

    j.   Whether Plaintiff and the Classes were injured as a proximate cause or result of the data breach;

    k.   What the proper measure of damages is; and

    l.   Whether Plaintiff and the Classes are entitled to restitutionary, injunctive, declaratory, or other relief.

74.   *Superiority and Manageability.* A class action is superior to individual adjudications because joinder of all class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount-in-controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

75.   *Injunctive or Declaratory Relief.* In addition, Defendants acted or failed to act on grounds that apply generally to the Classes, such that final injunctive or declaratory relief as to any one class member is appropriate as to all class members.

## CAUSES OF ACTION

### Count 1: Negligence

### On Behalf of the Class and Subclass

76.   Plaintiff incorporates by reference all of the above allegations.

77.     Plaintiff and the Class entrusted their PII to financial institutions who turned that information over to Defendants. Knowing this, Defendants owed to Plaintiff and other the Class a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the data breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

78.     Defendants owed a duty of care to Plaintiff and the Class because it was foreseeable that Defendants' failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PII—just like the data breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and the Classes' PII failing to properly supervise both the manner in which the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

79.     Defendants owed these duties to Plaintiff and the Classes because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security protocols. Defendants actively sought and obtained Plaintiff and the Class's personal and financial

information in the conduct of its business, and Defendants retained that information.

80.     The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII.

81.     PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PHI and PII of Plaintiff and the Classes and the importance of exercising reasonable care in handling it.

82.     Defendants breached their duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiff and the Classes, which actually and proximately caused the data breach and Plaintiff and the Classes injury.

83.     Defendants' breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and the Classes' actual, tangible, injury-in-fact and damages, including, without limitation, theft of their PII by criminals, improper disclosure of their PII, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the data breach.

## Count 2: Negligence Per Se
## On Behalf of the Class and Subclass

84.     Plaintiff incorporates by reference all of the above allegations.

85.     Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Classes' PII.

86.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, employees' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff's and the members of the Classes sensitive PII.

87.     Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect its employees' PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to its employees in the event of a breach, which ultimately came to pass.

88.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous

enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Classes.

89.    Defendants had a duty to Plaintiff and the members of the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiff and the Class's PII.

90.    Defendants breached their respective duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and members of the Classes' PII.

91.    Defendants' violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence per se.

92.    As a direct and proximate result, Plaintiff suffered actual losses and damages, including, without limitation, theft of his PII by criminals, improper disclosure of his PII, lost value of his PII, and lost time and money incurred to mitigate and remediate the effects of the data breach that resulted from and were caused by Defendant's negligence.

**Count 3: Breach of Contract**

**Against Defendant KeyBank, N.A.**

**On Behalf of the Class and Subclass**

93.    Plaintiff incorporates by reference all preceding allegations.

94.     Plaintiff and the Classes entered mortgage contracts with KeyBank.

95.     Those contracts are valid and supported by consideration.

96.     As a condition of those contracts, KeyBank required Plaintiff and the Classes to provide it with their PII.

97.     KeyBank's privacy policy was an implied term of the contract.

98.     KeyBank's privacy policy states, "we take the security of your data and information seriously. That's why we use sophisticated tools, technology and training to keep the information you trust to us safe, protected and secure." The privacy policy further provides that KeyBank will use "[i]ndustry-leading cybersecurity tools, practices and technology," "[m]ultifactor identification practices that protect clients' identities," and its "Cyber Defense Center, which tracks the latest threats."

99.     KeyBank failed to safeguard Plaintiff and the Classes' data in accordance with its privacy policy.

100.   As a result of KeyBank's breach of contract, Plaintiff and the Classes suffered damages.

**Count 4: Unjust Enrichment**

**Against Defendant KeyBank, N.A.**

**On Behalf of the Class and Subclass**

**(In the Alternative to Count 3)**

101.   Plaintiff incorporates paragraphs 1–92 by reference.

102.   Plaintiff and the Classes conferred a benefit on KeyBank in the form of payments associated with their mortgages. KeyBank also benefitted from the receipt of Plaintiff and the Classes' PII, as this was used for KeyBank's commercial purposes.

103.   KeyBank knew of the benefits conferred on it by Plaintiff and the Classes.

104.   Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff and the Classes' services and their PII because KeyBank failed to adequately protect their PII. Plaintiff and the Classes would not have provided their PII to KeyBank if they had known KeyBank would not adequately protect their PII.

105.   KeyBank should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Classes all unlawful or inequitable proceeds it received due to its misconduct.

## PRAYER FOR RELIEF

106.   Plaintiff, individually and on behalf of all others similarly situated, hereby demands:

      a. Certification of the proposed Class and Subclass;
      b. Appointment of the undersigned counsel as class counsel;
      c. An award of all damages, including attorneys' fees and reimbursement of litigation expenses, recoverable under applicable law;
      d. Restitution or disgorgement of all ill-gotten gains; and
      e. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

107.   Plaintiff demands a jury trial on all applicable claims.

Respectfully submitted,

By: /s/ *Matthew R. Wilson*

MEYER WILSON CO., LPA
Matthew R. Wilson (871480)
Email: mwilson@meyerwilson.com
Michael J. Boyle, Jr. (*pro hac vice* to be filed)
Email: mboyle@meyerwilson.com
Jared W. Connors (*pro hac vice* to be filed)
Email: jconnors@meyerwilson.com
305 W. Nationwide Blvd.
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

TURKE & STRAUSS LLP
Samuel J. Strauss (*pro hac vice* to be filed)
sam@turkestrauss.com
Raina Borrelli (*pro hac vice* to be filed)
raina@turkestrauss.com
613 Williamson St., #201
Madison, WI 53703
P: (608) 237-1775

*Counsel for Plaintiff and the Proposed Class and Subclass*